J. Henry POLKINHORN, Executor of the Estate of Grace B. Affleck, Deceased, and John H. Polkinhorn, Trustee of the Testamentary Trust under the Will of Philip G. Affleck, Deceased, Appellants,

v.

UNITED STATES of America.

No. 22994.

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1970.

Decided Aug. 26, 1970.

Mr. W. Barrett McDonnell, Washington, D. C., for appellants.

Mr. Gordon S. Gilman, Atty., Department of Justice, for appellee. Asst. Atty. Gen. Johnnie M. Walters, and Messrs. Thomas A. Flannery, U. S. Atty., Lee A. Jackson, Loring W. Post, and Mrs.

Carolyn R. Just, Attys., Department of Justice, were on the brief for appellee.

Before McGOWAN and TAMM, Circuit Judges, and NICHOLS,* Judge, United States Court of Claims.

NICHOLS, Judge:

This suit for refund of U.S. Income Taxes was submitted to the late Judge Holtzoff on stipulated facts. He held for the defendant in an opinion delivered orally from the bench and reported D.C., 293 F.Supp. 865 (1968). The plaintiff appealed. We reverse.

The dispute concerns a single item that defendant added to the 1960 income tax return of Grace B. Affleck, since deceased, resulting in a deficiency of $10,112.33, including interest. Taxpayer paid it, made a timely claim for refund, and on its disallowance the instant suit was filed within the required time. The appellee asserts, and the court below agreed, that she should have reported as ordinary income a sum of $27,500 paid to a financial institution by a lessee, to remove encumbrances on real estate in which she had a life estate.

The suit is brought in the names of J. Henry Polkinhorn, executor of the estate of Grace B. Affleck, and John H. Polkinhorn, trustee of the testamentary trust of Philip G. Affleck, deceased, both being the same person. Grace B. Affleck was the taxpayer and the issue is her personal income tax liability.

Mrs. Affleck was the widow of Philip G. Affleck, who during his life had been a large holder of District of Columbia real estate. He died in 1947, leaving a will, the terms of which are crucial to the instant controversy. After small specific bequests, he devised the residue to Grace B. Affleck, "to have and to hold for and during her natural life." This included all his real estate. She was to maintain it properly, pay taxes and assessments levied thereon, and pay "all interest on existing or future encumbrances on such properties or any there-

of." In case of sale, the proceeds were to be reinvested in real estate.

He also designated a trustee who was to take over the property, upon her death. Meanwhile, the trustee's consent was required for any purchases and sales of real estate she might make. After her death he was to manage and control the properties with usual trustee powers, and to pay the income to named beneficiaries during their lives. After their death he was to pay over the entire principal then existing to two churches, both of Berryville, Virginia.

Item VII reads as follows:

My said wife and my said trustee are each given full power and authority to renew, replace or pay any encumbrance secured upon any real estate I may own at the time of my death and to execute such deed or deeds or other instruments as may be required. To enable them to properly administer the trusts hereby created I authorize and empower them and each of them to execute such deed or deeds as may be necessary or proper, and hereby relieve any and all purchasers and any and all lenders of money secured on any such property from seeing to the application of the purchase money or money loaned.

Item IX authorized the "personal representative or representatives" to borrow money on the security of trust real estate to pay estate, inheritance and possibly other taxes, interest on any such borrowings to be paid off out of the life tenant's income so far as possible.

Mrs. Affleck had no power to invade the corpus or redirect its distribution. We think it is fairly to be inferred that she had no authority to encumber the real estate to raise funds for her personal support or to relieve her from maintaining the property, but could do so to replace or renew existing encumbrances or to improve the corpus of the estate, albeit the trustee's consent might be required. We also infer that the widow could look to the corpus for payment of

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 293(a).

the principal amount of any such authorized encumbrance even though she might also be personally liable to the financial institution as maker or co-maker of any note it secured. It was, of course, as already noted, expressly provided that she was liable for any interest. We think this was the testator's scheme, it agrees with the parties' practical interpretation, and defendant's brief does not contend otherwise.

The instant controversy involves Lots 833 and 868 in Square 140, originally improved by the premises known as 1826 M Street, N.W. In 1958 Mrs. Affleck encumbered them with three notes totaling $27,500, of which $17,000 was to take care of an existing encumbrance and $10,000 to improve other property belonging to the estate. (The record is not as full as it ought to be on this point, but the above is expressly stated in Mr. Polkinhorn's deposition, which the parties apparently intend to be taken as part of the stipulation.) Mrs. Affleck signed the notes and was personally liable on them, we assume, but if our analysis is right so far, she could pay the notes from amounts realized on estate assets, or she could renew them.

In September 1960, she leased lots 833 and 868, with improvements, to Gustave Ring and others. The trustee joined as lessor and representatives of the charitable remaindermen indicated approval by their signatures. The tenants were to hold for 99 years at a rental of $1,107,500, payable by assumption and discharge of the $27,500 encumbrance above mentioned, and in addition $833.34 per month. The tenants could raze the improvements and were to discharge the encumbrance before doing so; and they could erect other improvements. They were to pay the interest on the notes until discharged. That same year, 1960, the tenants did in fact pay the $27,500 note with accrued interest, did raze, and did erect a new building thereafter. As stated, this payment is the alleged income received by Mrs. Affleck.

The appellee relies on the rule that benefits to a taxpayer in the form of payments in his behalf by another are income, e. g., United States v. Boston & M. R. Co., 279 U.S. 732, 49 S.Ct. 505, 73 L.Ed. 929 (1929). Also it quotes Section 1.61–8(c), Treasury Regulations on Income Tax (1954 Code) enumerating as income to a lessor various expenditures by a lessee that benefit him. Here, however, there are two lessors, life tenant and trustee for the remaindermen. Both together are referred to in the lease as "the landlord." Appellee's authorities do not exonerate us from the duty of inquiring: which lessor did the $27,500 payment benefit?

■ The answer is obvious: the remaindermen benefited because the net capital value of the corpus was increased by $27,500. The life tenant did not benefit because she could not have availed herself of the $27,500 payment or any part thereof directly or indirectly.

"But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." Holmes, J., in Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930).

■ In case of a sale of real property subject to a life estate, the life tenant is not entitled to a distribution of the estimated value of the life estate, but only to interest or other net income derived from the proceeds during his life. United States v. 122,000 Acres of Land, 57 F.Supp. 421 (N.D.Texas 1944).

Appellee says, rightly of course, that Mrs. Affleck was relieved of paying interest on the notes during the rest of her life. This benefit, however, was reflected in the enhancement of her taxable rental income from the payment to her death, as she would no longer have the interest deduction to offset against her gross income. It cannot be arbitrarily assigned a value of $27,500 and

taxed again. Appellee also says she benefited by having the notes discharged, as she was personally liable. This, however, overlooks the fact that under the testator's scheme, she never would have had to pay personally loans raised to renew existing encumbrances, or to improve the estate, unless the estate had been in a condition of insolvency, of which there is no sign in this record. Appellee also says she could have arranged to receive the $27,500 directly. It is hard to see how the trustee for the remaindermen could properly have entered into a lease making such a provision, but if he had wrongfully done so, it would appear Mrs. Affleck would have held the money as a constructive trustee and could not have dealt with it as funds in which she had a beneficial interest. It would seem sufficiently apparent that a life tenant who arranged with the lessee under a 99 year lease to receive beneficially a fraction of the agreed rent for the entire term, out of proportion to the life tenant's life expectancy, would be invading the corpus and robbing the remaindermen.

The above analysis of the situation is, we think, supported by Weil v. United States, 148 Ct.Cl. 681, 180 F.Supp. 407, cert denied, 364 U.S. 822, 81 S.Ct. 58, 5 L.Ed.2d 52 (1960) in which a widow who under her husband's will had only a life interest in certain securities with remainders over was held not personally taxable on capital gains realized therefrom. The court also held she was taxable on them as a fiduciary though not one in the technical sense.

Chief Judge Jones wrote for the court, 148 Ct.Cl. at 685, 180 F.Supp. at 410

> Although plaintiff is entitled to "the entire income" from the residuary estate for life, this "income," under the terms of the will, does not include gains realized on the sale of the assets. Her only interest in capital gains was a right to the income from their reinvestment.[3] [Footnote omitted.]

Unquestionably, the plaintiff might derive some economic benefit from the capital gains realized on the sale of the securities.[4] [Footnote omitted.] The benefit however, is necessarily limited to the possible increase in ordinary income resulting from the increase in the value of the corpus.

We do not think the case is helpful only with respect to capital gains to remaindermen and do not wish to be understood as necessarily holding that we are concerned with a capital gain here. This case was followed in both its aspects in United States v. De Bonchamps, 278 F.2d 127 (9th Cir. 1960, *en banc*). Other cases along the same lines are: Hirschmann v. United States, 309 F.2d 104 (2d Cir. 1962); Security-First National Bank v. United States, 181 F.Supp. 911 (S.D. Cal.1960); Axe v. United States, 191 F. Supp. 671 (D. Kansas 1961); Grimm v. Commissioner of Internal Revenue, 43 T.C. 623 (1965). It is characteristic of most of these cases that the law imposed by implication, on the life tenants, fiduciary obligations towards the remaindermen, no other fiduciary being designated. Here, of course, the testator appointed a fiduciary for the remaindermen, thus, it would seem, relieving the life tenant of most or all fiduciary responsibilities, including that of reporting gains inuring to remainder, for tax purposes. Thus the second holding of *Weil* and its progeny is not applicable here except with due regard for this difference in circumstances.

Mr. Polkinhorn now is the fiduciary and whether he should have reported the $27,500 or any part thereof as fiduciary income is an issue not before the court.

The case we believe would never have come this far if the lease had not designated the $27,500 payment as rental. We do not consider that as controlling, however, because it would seem that rental income, like stock income, might include many items that would inure to the benefit of the remaindermen, not the life tenant, e. g., improvements placed on the

property by the lessee. See Reg. § 1.61–8 (c), *supra.* The will nowhere measures life tenant's rights by what is "rental."

The court below did not focus on the above issues and deemed it to suffice to dismiss the complaint that, in its view, Section 108, Internal Revenue Code of 1954, did not exempt the payment involved. Our analysis might be deemed to moot that issue but for completeness we do consider it briefly.

This section reads as follows:

Sec. 108. *Income from discharge of indebtedness.*

(a) *Special Rule of Exclusion.*—No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if—

(1) the indebtedness was incurred or assumed—

(A) by a corporation, or

(B) by an individual in connection with property used in his trade or business, and

(2) such taxpayer makes and files a consent to the regulations prescribed under section 1017 (relating to adjustment of basis) then in effect at such time in such manner as the Secretary or his delegate by regulations prescribes.

There seems to be uncertainty as to what this clause was meant to do, not clarified by counsel's research into legislative history. The court below thought it applied primarily, if not wholly, to the gain realized when a person or corporation settles his own indebtedness for less than its face amount. We think, within its literal language, it also undertakes partly to undo the rule of Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947) where a taxpayer, in computing the gain or loss from a sale of business real estate, was held required to add to the cash payment the amount of any unpaid mortgage assumed by the buyer, even though the mortgage was one the taxpayer was not personally liable to pay and could not have paid. There was a vigorous dissent by three justices, and the decision certainly raises the spectre of a taxpayer realizing a large paper taxable gain but no cash with which to pay the tax. Legislative history is hardly necessary to sustain a result that is declared by statute without ambiguity. F. L. Smidth & Company v. United States, 409 F.2d 1369 (CCPA 1969). There is no legislative history that rebuts it.

If in the instant case the life estate and remainders had been merged, the facts would be like those in *Crane* and but for Section 108, the $27,500 payment would be taxable income to the lessor. The effect of Section 108 would be to allow the taxpayer who filed the required consent to adjust his basis and thus postpone the tax.

■ Since the life estate and remainder are here separate and since, as we have held, the payment inured to the benefit of the remaindermen, it would seem the consent should have been signed by the trustee for the remaindermen and not by Grace B. Affleck, who did in fact sign it. True, Mr. Polkinhorn's name appears as approving the consent, but the covering letter clearly shows the consent was intended to apply only to Mrs. Affleck's personal tax return. It may be that she or her tax advisers desired that she should take the adjustment. On her decease it would cease to have meaning: a new basis would be established for property in her estate. At any rate, there was no valid consent, and for that reason Section 108 has no application to the instant controversy.

If, however, the Internal Revenue Service had been correct in holding that the $27,500 payment inured to the benefit of the life estate, we see no reason why the consent would not have been

valid and sufficient to relieve Mrs. Affleck of the controverted tax.

 Mr. Polkinhorn brought this action both as Mrs. Affleck's executor and as the testamentary trustee. Since she personally paid the tax, he can maintain it only in the former capacity. The tax liability of the trust estate for any year or years are simply matters not before us. He did not file a claim for refund as trustee. These omissions are fatal to our jurisdiction to determine the trust estate's liability. Flora v. United States, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed. 2d 623 (1960); United States v. Rochelle, 363 F.2d 225 (5th Cir. 1966). Appellee says Mr. Polkinhorn as trustee is suing for a declaratory judgment which is barred by 28 U.S.C. § 2201. This appears to be correct. Therefore, we do not have before us the question whether appellant is entitled to a charitable deduction, as he strenuously urges. If there should properly be one allowed, it would be to the remainder estate, which is not a proper party herein.

It will be the responsibility of the Internal Revenue Service to determine in the first instance whether the trust estate is liable for income taxes on the $27,500 payment, whether it can now consent to an adjusted basis under Section 108, whether it is entitled to a charitable deduction and whether any tax is now enforceable in view of limitations.

As to these matters we express no opinion and indeed, have none. It suffices that the tax on the $27,500 payment was illegally exacted from Mrs. Affleck personally and her executor is entitled to recover it, with statutory interest.

In United States v. De Bonchamps, *supra*, the United States lost on its attempt to tax life tenants personally for capital gains inuring to remaindermen, but it had counterclaimed against the same persons in their fiduciary capacity imputed to them by law, and thus the court could resolve entirely the tax liabilities arising from the events involved. There is no such counterclaim before us here, and thus our powers are incomplete.

The judgment of the District Court is reversed and the cause is remanded for determination of defendant's liability in accordance with this opinion.